[No. 2834.]

## S. B. Allison v. The State.

1. CONTINUANCE—PRACTICE.—The refusal of a continuance asked because of absent witnesses was not error, when it appears that their testimony was fully supplied from other sources, and that no injury resulted to the defendant.

2. SAME—SEVERANCE.—A defendant has no right to demand that other defendants, separately indicted for the same offense, be first placed upon trial.

3. EVIDENCE—PRACTICE.—The defense in a murder trial asked a State's witness if he, the witness, did not, a short time before the difficulty, in the neighborhood of the witness's house, or in the neighborhood of Mar-

shall's house, state to T. L. Marshall that he, the witness, had given his son a double barreled shot gun, and had told his son that he must take his choice between the gun and his dogs. *Held*, properly excluded as referring to an immaterial matter; irrelevant, and inadmissible even for the purpose of laying a basis to impeach the witness by contradicting him.

4. SAME.—That a State's witness was under indictment for an assault with intent to murder the defendant, such alleged assault being a part of the same transaction for which the defendant was on trial, did not disqualify the said witness to testify on behalf of the State.

5. SAME.—The defendant offered a witness to prove that the constable of the precinct dispossessed the defendant of a school house at the suit of B., another witness, and offered in evidence the record and judgment in a case wherein B. had been convicted of defacing the said school house. *Held*, that notwithstanding the homicide in this case was the result of a feud concerning the school house, such evidence was inadmissible on behalf of the defense, and was properly excluded as irrelevant.

6. SAME.—Article 726 of the Code of Criminal Procedure provides that "the rules of evidence prescribed by the statute law of this State in civil suits shall, so far as applicable, govern also in criminal actions." Article 2257 of the Revised Statutes requires, among other things, that to render a deed admissible in evidence, it must be recorded and filed in the cause wherein it is proposed to use it at least three days before trial, with notice to the opposite party of such filing. *Held*, that in default of such filing and notice the court properly rejected a deed offered in evidence by the defendant.

7. SAME—ARGUMENT OF COUNSEL.—Pending argument on the admissibility of evidence offered by the defendant, the court required the jury to retire from the court room. *Held*, that such action was eminently proper.

8. SAME.—The defendant offered in evidence a record showing an appropriation of money by the county authorities for the construction of the school house concerning which the offense in this case was committed. *Held*, that the proposed evidence was properly excluded as irrelevant and immaterial.

9. PRACTICE.—CHARGE OF THE COURT that, "You, gentlemen of the jury, are the exclusive judges of the facts of the case and the weight of the testimony," is a charge upon the subject nearly in the language of the statute (Code Crim. Proc., Art. 728), and is sufficient.

10. SAME.—Requested charges, when they announce incorrect propositions of law, or when they announce correct principles which are embraced in the general charge of the court, are properly refused.

11. SAME—FACT CASE.—See evidence *held* sufficient to sustain a conviction for murder in the second degree.

APPEAL from the District Court of Young. Tried below before the Hon. B. F. Williams.

The indictment charged the appellant with the murder of John Rogers, in Young county, Texas, on the thirteenth day of February, 1883. His conviction was for murder in the second

degree, and his punishment was assessed at a term of fifteen years in the penitentiary.

Describing the school house in which the tragedy was enacted, its vicinity and bullet marks, T. H. Conner, the first witness for the State, testified that on the Monday previous to this trial he reduced them to a plat. He did not notice the range of the bullet which made the hole in the floor. The oak tree which figures conspicuously in the narrative of the various witnesses stood thirty-six feet southwest from the house. The holes in the gable end of the house were eight feet six inches from the floor, and near the centre of the building. A large oak tree stands sixty-nine feet from the southeast corner of the house. There were twenty-four buck shot holes in the north gable end of the house, which, as an examination showed, were made by shots fired from the southwest corner of the house. These holes covered a radius of twelve inches. The witness could see the light through these holes from the door, but not so well as from the southwest corner. The planks of which the house was constructed at this point were from a half to five-eighths of an inch in thickness. Two spots on the floor the witness took to be blood marks. The ends of the house were sixteen feet long, and the sides twenty feet long. Witness saw some small shot in the east wall, eighteen or twenty inches from the south wall. One pane of the window at the southwest portion of the house was broken, and so broken that a shot could have been fired through it and hit a man in range. A whole pane of glass was broken out of each of the two west windows. A ball from the northwest passing through the hole in the northwest window would strike an ordinary man about the middle of the body.

Jacob Schlitzer testified, for the State, that he was boarding with the defendant at the time of this homicide, and went with him, W. B. Munnerlyn, R. Taylor, R. B. Gass, J. H. Gass, Gus Serno, John Allison and H. W. Devasheer that night. When the party started from the defendant's house, some one in the crowd told John Allison to take his gun along. When the deceased got to the school house later, the defendant and Munnerlyn were inside. Rogers, the deceased, went inside and shook hands with them. Witness went to the east window and saw the defendant sitting by a table in the southeast corner, reading some papers. Witness then went to a tree east of the house, and presently saw J. H. Brown coming to the school house with a gun in his hands. Witness then went further east, and heard

Brown from the outside and Rogers from the inside talking in a loud voice. There was a lighted lamp on a shelf in the southeast corner of the house. Rogers was in the house some fifteen or twenty minutes before the firing began. Some fifteen or sixteen shots were fired. Witness saw but two guns in the party he was with. Gus Serno had one and R. Taylor the other. The defendant took an ax to the school house.

The parties mentioned by the witness came to the defendant's house that night before the homicide, and they all left together, going to the school house, Munnerlyn and Devasheer on horseback ahead. Munnerlyn returned to the party and reported that the school house was unoccupied. The party then went on, and some one broke open the school house door. Witness did not know who carried the things out of the house. Rogers was standing facing the defendant while the latter was sitting by the table as described. About this time some one kicked the door three times, and just then some one fired. A second shot was shortly fired, and the witness heard some one groan as though wounded. Each subsequent shot was followed by louder groans. The parties remained in the house some fifteen minutes. While the defendant, Rogers and Munnerlyn were in the house, before the shooting, at the time the witness saw them from the east window, they were all talking in a friendly manner.

The witness denied that in a conversation with Colonel G. A. Graham, after the fight, he told Graham that J. H. Brown fired the first shot. The party who groaned was neither the defendant nor Munnerlyn. Witness did not see Munnerlyn's gun examined after the fight. The first time he saw that gentleman with a gun was on the road to town after the shooting. When the defendant came out of the house after the conflict, he said that he was wounded, and the party started with him to town to see a doctor. At this time, when defendant and Munnerlyn came out of the house, a consultation was held at the southeast corner of the house, and it was decided to go to town and see the officers in advance of the other party. Witness did not know who fired the first shot that night. R. B. Gass and Devasheer left about the same time that the witness did, which was when the first shot fired. Witness recognized the guns in evidence as those in the possession of the defendant and Dick Taylor during the fight.

Grace Brown, for the State, testified, in substance, that she lived with her parents, about two hundred yards from the school

house. She was present when Rogers was killed; she was going to the school house with her mother, her sister Kirk, and Miss Gibson. The ladies mentioned went nearer to the school house door than the witness did. She saw Mr. Gass go to a tree some ten steps distant. No one went into the house while the witness was there. She heard her father, J. H. Brown, talking. The witness was standing at the southwest window, and, looking in, she saw the defendant shoot Rogers, who was standing in the house near the southwest corner. Mr. Munnerlyn was standing in the house at that time, near the door. Both he and the defendant had guns. After the first gun fired, the witness heard Rogers exclaim: "Don't shoot."

The witness, her mother and father, sister Kirk, Thomas and Miss Gibson, went home after the firing. Miss Gibson, Miss Kirk Brown and the witness returned presently, went into the house, removed Rogers's overcoat, and carried him fifty steps from the house. Thomas, Rogers and Miss Gibson were at supper at J. H. Brown's. Nolte came after supper. Rogers started first to the school house on being told that it was lighted up. J. H. Brown, with a double-barreled shot gun, and Thomas and Nolte followed Rogers. Witness and her party overtook Brown, Nolte and Thomas fifty-five or sixty yards from the school house. This party of ladies went within three or four steps of the door. J. H. Brown wanted them to go in, but some one on the inside said that they could not enter.

The witness was on her way to the window spoken of when her father, J. H. Brown, was shot. There was a lamp in the house while the witness was looking in at the window. The first shot was fired outside of the house. The second shot was that fired by the defendant, and which struck Rogers while the witness was looking on. Witness did say at the examining trial that she and Miss Kirk and Miss Gibson carried the deceased about five feet, but had since measured and found the distance to be fifty-five yards. She saw no pistol about the body of the deceased.

Nolte testified, for the State, that he saw Rogers alive about nine o'clock on the night of the killing, and next saw him somewhat later, dead. Witness took some provisions from Graham to Brown's place, arriving there about seven o'clock that evening. After supper some one said that there was a light in the school house. Rogers started to the school house, and was followed by J. H. Brown, Thomas, the witness and the ladies. On

arriving near the school house, the witness heard parties talking inside. Rogers asked by what authority the other parties had gone into the school house. Some one answered: "By commission of the county judge." Witness was behind the tree near the house, and heard the shot fired. At this time Brown was pushing the door. He, Brown, ran around the southwest corner of the house, when another shot was fired, and Brown broke the southwest window and fired into the house. Brown then ran to the tree where the witness was, and said: "I am ruined—I am shot." Immediately Mr. Taylor, from the southwest corner of the house, called out: "Who is that behind that tree?" A shot followed, and a ball whistled past the tree. Brown, witness and Thomas then ran towards Brown's house, and just as they started the witness saw Dick Taylor fire a gun towards the northwest window of the house. Brown was shot through the right hand.

When the party started to the school house that night, some one said that the defendant and Munnerlyn had been to town that day trying to get papers for the house, but had failed. Witness expected trouble when he got to the school house. When Brown reached the school house door he asked: "Men, what did you come here for?" Defendant and Munnerlyn replied: "We have possession of the house." The witness did not hear Brown say that the house was his property and that he would defend it. Witness was at Jefferies's saloon in Graham on the night of and after the difficulty. He stated to S. R. Jefferies and others that he was at home and in bed when the difficulty occurred. He made this statement because he was afraid of arrest. He did not remember making the same statement at the school house next day in presence of Z. F. Wood and Charles Jowell. Witness did not tell Dan. Applegate and John Miller, a few days afterwards, that he, witness, saw Dick Taylor shoot the deceased through the northwest window. Flat Rock school house, where Mr. John Rogers was killed, is in Young county, Texas.

Doctor James, for the State, testified that he examined the body of the deceased. The ball through the chest entered from the right side, passed through the body and out just below the left nipple. Another wound grazed the skull. The day following the shooting the witness dressed J. H. Brown's wounded hand and amputated the third finger of his right hand. A man holding a gun in a position to fire could be shot as Brown was.

There was no powder burn on Brown's hand. A gun will powder burn at a distance of three feet. Such a wound as Brown's could not have been made with a shot gun. The witness extracted a load of small shot from the defendant's shoulder on the night of the difficulty. A man standing in the school house with his shoulder to the west window could have been shot as the defendant was shot.

J. H. Brown testified, for the State, in substance, that after supper at his house some one reported a light at the school house, and said that it was on fire. Thereupon the parties named by previous witnesses started to the school house, the witness taking his shot gun. Taylor presented his gun and halted the witness near the school house. Witness could not see Taylor after that, but, through the window, could see into the school house. The defendant, Munnerlyn and Rogers were inside; Munnerlyn was holding the door, defendant in the southeast corner of the house, and the deceased stooping down reading a paper. The defendant was then holding his gun in such a position that, if discharged, it would shoot Rogers. Munnerlyn presented his gun when the witness approached the house, and witness proposed to put aside his gun if Munnerlyn would do likewise. Munnerlyn pointed his gun through a crack out of the house. The witness pushed on the door, which gave way and opened about fifteen inches, and witness was shot through the right hand. The first shot fired was the one that struck the witness. The next was seen by the witness as he ran around to the west window. It was fired by the defendant and struck the deceased. Three shots were fired before the witness shot. He fired the fourth shot through the window and ran to the tree. Taylor then asked: "Who is that behind that tree?" and another shot was fired. Rogers was standing at the end of a bench, facing the defendant, when the witness first saw him in the school house that night. Witness did not see him after that. Munnerlyn, Taylor and Gass were at the school house that night.

The witness stated that he was under indictment for assault with intent to kill the defendant in this affray. He, the witness, called to the ladies to go with him to the school house, and took his gun along to protect himself. He did not ask Nolte or Thomas to go with him. When witness first got to the school house, and within three or four steps from the southwest window, he saw Rogers inside the school house, and heard him say:

"If you have any authority to take the house I have nothing to say." Witness then went to the door, but Munnerlyn refused to admit him. He then pushed the door open and was shot in the hand. He then ran around to the window, fired through, and shot the defendant. Defendant fired at the same time. The witness denied that he had ever given his son a shot gun. His son went to Mr. Treue's that night, before the shooting, of his own accord. Witness did not send him and knew nothing of his going. Witness saw that the upper pane of the lower northwest window was broken. He stated before the jury of inquest that he did not know which window he shot through. Witness talked to Marshall about the broken window on Sunday, after the shooting, and told Marshall that Nolte said that was the window through which Dick Taylor fired when he shot Rogers. Witness did not say that he saw Dick Taylor shoot Rogers through this window. The book presented to witness was a volume of the Missouri Supreme Court Reports, and had been in the witness's family for a number of years, and was taken from witness's house during the examining trial. The printing, figures, etc., on the wadding exhibited is like that used in the make up of the book. It appeared to be a fragment from a leaf of that book. The book described was used by witness's daughter as a scrap book.

C. E. F. Aubury testified, for the State, in substance, that as a member of the coroner's jury he examined the body of the deceased. One shot entered the groin in front and went out at the hip behind; another entered the right breast and went out below the left nipple; another struck the deceased in the neck below the left ear, and passed down the jaw bone, cutting the flesh and making a wound wider below than above. Some of the jury thought this wound was inflicted with an ax; others that it was made by a ball; and the witness thought it the result of a blow. A gash on the head looked like it might have been made with an ax or the but of a gun. Two pools of blood were found in the school house. There were about two dozen buck shot holes in the north gable end of the house. Some small shot had penetrated the east wall at a point about as high as a man's shoulder. There was a slanting bullet hole in the floor. The ball ranged from the south to the north, and was either a forty-four or forty-five calibre. Witness picked up two rim-fire forty-four calibre cartridges in the house. A Henry rifle cartridge was applied to and fitted the wound in the body of Rogers. A

small loaded derringer pistol and a medium sized pocket knife were found in the pocket of the deceased. The defendant's gun used a rim-fire cartridge.

J. T. Cunningham, the justice of the peace who presided at the coroner's inquest, testified substantially as the witness Aubury did, and, in addition, stated that after the inquest they went to Brown's house and examined his gun. One barrel was empty. The articles exhibited, to wit, a loaded derringer, a pocket knife, a bunch of keys and a lease from Brown of the Flat Rock school house, were found on the body of the deceased. In the house the witness found three empty cartridge shells, and one cartridge which had snapped but not exploded. He found another just outside of the school house. He found also a commission to the defendant, W. B. Munnerlyn and L. D. Bullard, as trustees of the "Flat Rock School House Community, No. 24," and the revocation of the commissions of J. H. Brown, R. B. Gass and John A. Treue as such commissioners. Also some gun wadding of paper torn from a volume of Missouri Supreme Court Reports. This wadding was found inside the house, three feet from the north wall and directly under the shot holes in the north gable end. One bullet that had been fired through the floor was found inside of the house, another outside, and a buck shot was found in the left lapel of the deceased's overcoat. Witness found an ax with a gap in the blade at the school house, and lying on the ground near the door the piece of a link of trace chain, which showed that it had been cut in two with an ax. This piece of link exactly fitted an impression in the side of the door.

L. P. Brooks, one of the jury of inquest, testified. for the State, that he examined Brown's gun at the time of the inquest. He found one barrel loaded and one empty. The loaded barrel had not been recently discharged. The other one had. Witness extracted the load from the loaded barrel with considerable difficulty, as the wadding was rusted and was hard to move. The load consisted of twelve buck shot.

The narrative of S. A. Thomas, one of the party who went from Brown's house to the school house on the night of the killing, was consistent with that of the others of that party.

Miss Kirk Brown testified, for the State, substantially as her sister Grace did, except that she said nothing about seeing the defendant at the school house. She peeped in and saw Munnerlyn at the door with a gun in his hand. He refused the de-

mand of Mr. Thomas and of Mr. Brown to permit the ladies to enter the school house. She saw Taylor at the southeast corner of the house, and heard him halloo to those in the house not to let any one in. She saw Munnerlyn's gun pointed out at or near the door when Brown first pushed the door. It was withdrawn on Brown's call not to shoot. Brown again pushed the door, and it opened partially, when the shooting commenced. The witness saw no weapons about the person of the deceased.

The sheriff of Young county testified, for the State, that he went to the Flat Rock school house on the night of the killing, and examined the body of the deceased and the school room for arms, but found none. He did not put his hands in the pockets of the deceased. Thomas, Treue and Treue's son were with the body when the witness arrived, and witness left the body in Treue's charge.

Here the testimony in chief of the State was closed.

John Miller was the first witness for the defense. He testified that he made a careful examination of the school house and premises on the day before this trial. He found twenty-four buck shot holes in the north gable end of the house, covering a space of two feet in diameter. They were about ten feet from the floor. Five sticks, about fourteen inches long, were inserted in as many of the holes. By means of these sticks the witness was enabled to determine the course of the shot. They were fired directly from the door. There was a plain mark of a shot on the limb of a tree which stood eight or nine feet north of the gable end of the house, and in range of the shot holes. This limb was in perfect range of the shot holes described and the door. The southwest window of the house had one pane of glass broken out. The northwest window had one pane of glass half broken out. When the witness first examined this northwest window, about three weeks before this trial, it had a hole in it about three inches long by one inch wide. Dan. Applegate and F. L. Marshall were present with the witness on this last examination of the school house and premises.

The witness was present when a conversation transpired between F. C. Nolte and Dan. Applegate on the Graham and Weatherford road. It occurred shortly after the killing of Rogers. Nolte told Applegate that he saw Dick Taylor shoot Rogers through the northwest window, with a buffalo gun, striking Rogers in the breast. Nolte touched his breast with his finger to locate the place at which Rogers was shot by Taylor. Nolte

said that he was fifteen steps away, behind a tree, at the time Taylor shot Rogers.

T. L. Marshall was the next witness for the defense. He testified that he lived about three hundred yards east from the Flat Rock school house. He heard the shots fired at the time of the killing of Rogers, and saw the reflection upon the windows of the school house, but did not go to the house. When he first examined the windows, after the difficulty, he saw that one pane of glass was broken out of the southwest window, which window was on the side of the house, and one pane of glass in the northwest window was cracked. The witness attended a school meeting at the school house on the Saturday before the killing, and saw that the glass in the northwest window was then in the same condition it was when he first saw it after the killing. In a week or two after the homicide one-half of this same glass, in the northwest window, was broken out by some one. It was possible, perhaps, but scarcely probable that a bullet could have passed through that glass without shattering it to fragments.

The witness examined the school house on the day before this trial. Concerning the location of the bullet holes, he testified as did the witness Miller, and declared that indications showed that the twenty-four holes in the north gable end and the one in the tree limb were made by shots fired from the door. With the school house door standing open fifteen inches, a man could stand at the door and fire shots which would strike the gable end as the twenty-four shots described had done. Witness had a conversation with J. H. Brown a short time after the difficulty, in which Brown said that Dick Taylor shot Rogers with the buffalo gun through the hole in the northwest window. The witness told Brown that that could not be true, for the window was in the same condition after as before the difficulty, and that a ball could not pass angling to a point to the right or center of the building, without breaking the glass.

The witness attended the school meeting on the Saturday before the killing by request of J. H. Brown, and agreed to the employment of Rogers to teach school, at a monthly salary of thirty-five dollars, of which the witness was to pay two dollars and a half. On the Monday thereafter, which was the day before the killing, witness was at the school house talking to Brown, when Rogers joined them. Witness then told Rogers that he would be responsible for his subscription of two dollars and a

half only so long as he sent to the school; that he thought of moving from the neighborhood. In that conversation Rogers said that W. B. Munnerlyn was a "d—d hog thief," and that he, Rogers, "wanted no truck with him." The witness heard six or seven shots fired at the time of the killing. The first two sounded like the reports of a shot gun. The next two or three sounded like the shots of a pistol. The remaining ones were louder and sounded like the reports of a rifle or large gun. The light in the school house was extinguished as soon as the shooting ceased.

Doctor R. N. Price testified, for the defense, that he went to amputate Brown's middle finger on the day after the shooting. The ball had entered about midway between the second and third joints, about half an inch from juncture with the right hand, and it passed through the hand in a direct line, coming out on the inside of the wrist, above the center. The witness inserted his finger in the hole. The wound could have been made with a Henry rifle, but not with a shot gun. In the opinion of the witness it was barely possible that Brown could have used his forefinger in firing a shot gun after he received this wound. The wounded hand was not powder burned. The hand had been washed before the witness saw it, but powder burn will not wash off. Powder will burn at a distance of three or four feet from a shot gun, but not so far from a rifle or pistol. The witness did not think that a party standing at the left of the school house door, and pushing with his right hand (as was described to have been the case with Brown) could have been wounded in the manner in which Brown was wounded. A man holding a shot gun in position to fire, the right being lower than the left hand, could have been wounded in the manner in which Brown was. Brown's wounded finger was bent towards the center of the hand at the time the shot struck it. On the day after the homicide, the witness was called to see Mr. W. B. Munnerlyn, in Graham. He found Munnerlyn badly powder burned on the left side of his face and around his eyes. His left coat sleeve was also burned at a point about half way between the cuff and the elbow. Both lapels of his coat had been shot through with buckshot. On receiving these powder burns, as Munnerlyn must have received them, he could not possibly see anything for more than ten minutes.

Dan. Applegate testified, for the defense, that shortly after the shooting he had a conversation with F. C. Nolte, on the

Graham and Weatherford road, in the presence and hearing of Miller. Nolte said that he was a Brown man; that Brown began right and ended right; that Taylor killed Rogers with a buffalo gun, by shooting him in the breast. Witness examined the school house. He saw Mr. Marshall place six straight pins in the holes in the gable end of the house. The ends of the sticks on the inside pointed directly to the door, and the ends on the outside to a limb of a tree on the north side of the house, which had been penetrated by a shot.

J. F. Brim testified, for the defense, that he had seen the Flat Rock school house since the difficulty. He saw but one of the blood spots indicated on the diagram. The shot holes in the gable end could be seen through from either corner of the house, but more plainly from the door. The witness's impression when he examined them was that they were made by shots fired from the door. The limb of the tree north of the gable end was about the size of a man's thumb. The ball which struck it, the witness thought, was fired from the ground.

R. J. Hamilton testified, for the defense, that on the night of the difficulty W. B. Munnerlyn came to his house with his face and eyes powder burned, with a hole burnt through his left coat sleeve, and with the lapels of his coat perforated with buckshot. He brought a double-barreled shot gun to the house. The shot gun had not been recently discharged. The witness examined it critically, testing the muzzles for moisture, and examining the caps. The caps had evidently been on the tubes for several days. The witness examined the school house a few days after the difficulty. The southwest window had a pane broken out, the glass falling on the inside. A small space, about three inches long and one inch wide, was broken out of a pane in the northwest window, the glass falling on the outside of the house. The shot on the tree limb outside, and the holes in the north gable end of the house, were on a direct range from the door, indicating that they were made by shots fired from the door.

J. T. Cunningham, justice of the peace, testified, for the defense, that on January 15, 1883, a forcible entry and detainer suit, styled J. H. Brown v. S. B. Allison, was filed in his court. On the trial, February 1, 1883, the jury rendered a verdict in favor of the defendant, upon which the witness entered judgment for the defendant. On the day of the killing, after the judgment had been entered, the defendant Allison applied to the witness for a writ of possession, which the witness at first

wrote out, but then tore up, telling the defendant that the case being decided in his favor, he, the witness, could not issue a writ of possession. The witness did not, in the office of Arnold, Glasgow & Arnold, tell defendant that they (defendant and his associates), in contemplation of law, were in possession of the school house and needed no writ of restitution. Judge Arnold did, in the presence of the witness, say to the defendant that, in contemplation of law, defendant was in possession. The affidavit, citation, return and judgment in the case of Brown v. Allison, referred to, were here offered in evidence by the defense. Resuming, the witness Cunningham said that County Judge Arnold threatened to mandamus him, witness, if he did not issue the writ (of restitution?).

County Judge R. F. Arnold testified, for the defense, that on January 11, 1883, acting upon a petition of a majority of the enrolled patrons of Flat Rock School House Community, No. 24, he issued a revocation of the appointments of J. H. Brown, J. A. Treue, and R. B. Gass as trustees of said community, and at the same time, upon a like petition, commissioned as such trustees L. D. Bullard, W. B. Munnerlyn and the defendant.

Gus Seymour (who, in the statement of facts, is sometimes called "Gus Serno" and "Gus Semo") testified, for the defendant, that he was acquainted with G. W. Hunt, a witness who testified before the examining court in this case. The said Hunt died about a month before this trial. Thereupon, the defense read in evidence the written testimony of Hunt, taken before the examining court.

The substance of Hunt's testimony was that on the Saturday before the killing he had a conversation with John Rogers, the deceased. Rogers asked the witness if he had ever heard Munnerlyn or the defendant say anything about him. Witness replied that he had only heard them say that he, Rogers, was a nice gentleman. Rogers then asked witness if Munnerlyn and defendant had not been talking about him. He, Rogers, said that he did not care what they said about him; that he was going to teach that school if he lived. He said, further, that neither Munnerlyn, defendant nor any one else could get possession of that school house unless they took it over his dead body. Witness told no one, not even Munnerlyn nor defendant, about this conversation until after the difficulty.

Cross-examined, the witness, Hunt, stated that he lived on land rented from Munnerlyn. The conversation referred to

occurred between Harmon's and Goode's places. Rogers was then on his way to his father's. Rogers brought up the conversation in discussing his school. Witness met Rogers on this occasion at Harmon's house. The witness first saw Munnerlyn and defendant, after this, on Tuesday morning. Rogers was killed that night. Witness, defendant and Munnerlyn met that morning at Munnerlyn's house and went to town together. Witness said nothing to them then about the conversation with Rogers, nor did he hear them say anything about the school or school house. Though the witness and his wife did not go for that purpose, they stayed at Munnerlyn's house all of the night of the killing. Witness heard no shooting that night. He told Mrs. Munnerlyn what Rogers said, about six o'clock. The witness got up about three or four o'clock, when Taylor, Jesse Gass and John Allison came to Munnerlyn's and told of the difficulty. The witness did not tell Mr. Johnson that he was at home in bed with his wife on the night of the difficulty, but did tell him that he was in bed with his wife. Witness had known Rogers but a short time, and had been in his company four times.

Mrs. John Harmon testified, for the defense, that the deceased came to her house a short time before the difficulty. Mr. Hunt was there at the time. Hunt and deceased left the house together, going east, on foot. This was after Rogers began teaching at the Flat Rock school house, and on the Saturday before he was killed.

Hiram Harmon corroborated the testimony of Mrs. Harmon, and stated, in addition, that he attended the school taught by Rogers. On Tuesday, the day of the killing, the deceased went home to dinner with the witness, and, en route to the house, told the witness that if the defendant, Munnerlyn and Bullard got possession of the school house they would have to kill him.

William Hull testified, for the defense, that he lived about two hundred yards from the school house, and about the same distance from J. H. Brown's house. He heard a gun fire at Brown's house about dusk on the evening of the difficulty. Witness saw the defendant and Munnerlyn about dusk on that evening. Defendant gave witness a magazine, with the request to leave it at his, the defendant's, house. He, the defendant, said that he and Munnerlyn were going to the school house, and would take possession of it if no one was there to interfere, and would begin school next morning, but that, as they intended to

have no trouble about it, they would not attempt to get possession if any one was in the house. Witness went to defendant's house with the magazine that night, and shortly afterwards Dick Taylor, John Allison, W. B. Munnerlyn, H. V. Devasheer, Sam Allison, Gus Semo, H. B. Gass and Jesse Gass arrived. Jacob Schlitzer was there. The witness saw three guns in the party. John Allison, Gus Semo and Dick Taylor each had one. The party named, including the witness, started to the school house together, Devasheer and Munnerlyn going ahead on horseback, to ascertain and report whether or not the school house was occupied. It was agreed that if any one was in the house no effort would be made to occupy it. Devasheer and Munnerlyn returned and reported that it was unoccupied. The party went on to the house. Munnerlyn and the defendant went inside, and the others disposed themselves around on the outside, the witness taking a seat at a tree ten steps from the house. Witness remained but five minutes, and went home. Munnerlyn and defendant moved some books and a stove while the witness was at the tree. Witness heard the firing within three-quarters of an hour after he reached home. The first two reports were those of a shot gun, the third, fourth and fifth those of smaller arms, and the remaining four or five were louder than the previous ones. Witness was familliar with the report of Taylor's buffalo gun. He did not hear it that night. The defendant and Munnerlyn said that the officers would not give them possession of the school house, and that they were going to take it.

Mrs. M. A. Taylor, the wife of Dick Taylor, testified that her husband owned a large buffalo gun. She recognized the eight cartridges and five empty cartridge shells as belonging to her husband. The belt in which they were Dick Taylor kept hanging on a rack in the house. A short time before the killing of Rogers, the witness saw her husband fire twice at a flock of geese, and a day or two before the homicide she heard him shoot three times at a wild cat. She knew it was a wild cat from the fact that he brought the animal's skin home. The belt then contained eight loaded cartridges and five empty shells. Dick Taylor used seven different kinds of large iron instruments in loading the cartridge shells, and the witness knew that he loaded none of them on the night of the homicide, from the fact that the iron instruments were left at home. When her husband went off that night, he took his gun, saying that he might

A.1

get a shot at a wild cat. He took no pistol with him to the school house that night.

R. B. Gass, for the defense, identified a coat exhibited as that worn by W. B. Munnerlyn on the night of the difficulty. The left sleeve was burned somewhat, and the lapels were torn or frazzled. He also recognized another coat as that worn by the defendant on that night. The left shoulder of the coat appeared badly torn by shot, and there was a small round hole through its right lower front. The defendant here exhibited a wound in the left shoulder, which he received in the difficulty. Continuing, the witness stated that he went to the school house on the night of the difficulty in company with the various parties named by the witness Hull. He went for the purpose of meeting the school trustees, at the request of Mr. Munnerlyn. Munnerlyn and the defendant were in the house, moving books, slates, etc., when the witness arrived. Presently Mr. Rogers came, and was met at the door by the defendant, and the two shook hands. Rogers asked the defendant why he had taken possession of the house, and said that he had leased it from J. H. Brown. The defendant answered that he took possession of the house by virtue of his commission as school trustee issued by the county judge of Young county. The defendant then read to Rogers the commissions of himself, L. D. Bullard and W. B. Munnerlyn as school trustees. He also read to Rogers the revocation of the commissions formerly held by J. H. Brown, R. B. Gass and John A. Treue. Thereupon Rogers and the defendant began to quarrel about the matter, and Rogers said that he was no "G—d d——d thief."

The witness was at the southeast window when Rogers came up. Later J. H. Brown came up, cocking his gun as he approached. Witness also thought he heard the cocking of a pistol on the outside, but was not certain. Thereupon Munnerlyn and the defendant got their guns, which had been standing some distance from them in the southeast corner of the school room. Brown came up to the door and demanded admittance. This Munnerlyn refused. Brown then said that he was on his own property, and that he would defend it, and demanded that the ladies be admitted. Munnerlyn again refused. Brown was kicking at the door during this time. The witness was then looking in at the southeast window. Rogers was then standing in the southwest corner of the school house, with his right hand behind him and his left hand in his left pants pocket in front.

The first shot was fired from a shot gun into the house from the front door. The witness saw the flash on the window panes. Brown then ran around the house to the southwest window, and fired another shot from a shot gun. Just after this second shot the defendant hallooed. Three pistol shots were then fired, and then there were three or four louder shots, which sounded as though they were fired by Henry rifles.

Just after the second shot Brown ran to a tree southwest of the house and stopped. Some one came out of the house and asked: "Who is that behind that tree?" A shot was then fired towards the tree from the direction of the party who asked the question, and Brown exclaimed: "I am ruined," and ran off in the direction of home, complaining of his wounds. Munnerlyn was not in the room after the second shot was fired. He was blinded by powder burn and came out of the house. The witness saw none of the women on the ground after the first shot was fired. When Brown first came up to the house he said that he would shoot. The first shot fired was from a shot gun, and the witness was then at the southeast window. When the second shot was fired the witness started away from the house. There was sufficient time for a party to pass from the door to the southwest window between the first two shots. One person could have fired all three of the pistol shots. These small shots, which the witness called pistol shots, could not have been fired from a Henry rifle. Witness saw no pistols in the crowd with which he went to the school house. Neither Munnerlyn, defendant nor Taylor had a pistol.

Munnerlyn was standing with his shoulder against the door just before the first shot was fired. Before this shot was fired Munnerlyn told Brown that he wanted no trouble. Just after the first shot was fired Brown stepped back from the door with his gun in his right hand. The witness and the parties with him took a Henry rifle, a double barreled shot gun and a buffalo gun to town that night. The witness did not hear the report of the Taylor buffalo gun that night. Witness was teaching school at the Beard house, and was employed by the defendant, Munnerlyn and Bullard as the trustees of community number twenty-four. Witness knew at the time that Rogers was teaching in the Flat Rock school house. Witness did not know where his son Jesse and Gus Semo were during the shooting.

W. F. Bunger, sheriff of Young county, testifying for the State, identified the coats in evidence as those taken by him

from the defendant and Munnerlyn when arrested after the homicide. Neither defendant, Munnerlyn nor Taylor made any effort at concealment. Witness went to J. H. Brown's house and secured an army size cap and ball pistol. It appeared to have been freshly loaded. He also secured at Brown's house a double barreled shot gun, and an old copy of the fifth volume of the Missouri Supreme Court Reports. These various articles were now in the same condition as when he got them.

Gus Semo (evidently the Gus Seymour sworn for the prosecution) testified, for the defense, that he went to the school house on the night of the homicide in company with the parties named by the witness Hull. Munnerlyn and Devasheer rode on ahead, to ascertain if the house was occupied, it being agreed that if it was no effort would be made to take possession. They returned to the party and reported that the house was empty. When the witness reached the school house the door had been broken in and was open. Defendant, Munnerlyn and Bullard, as trustees, requested the party to go in and see that no damage was done in taking possession. When the deceased arrived, shortly afterwards, he was met at the door by Munnerlyn and the defendant, and the parties shook hands. Rogers asked by what authority they assumed to take possession. Defendant replied: "By virtue of our commissions as trustees." Rogers demanded to see their commissions. The defendant read them to him, and he demanded that the commissions be given to him. The defendant refused this demand, and the deceased then said to defendant: "Then I will shoot your d—d liver out."

About this time Brown came up to the door, demanded and was refused admittance. Rogers then said that if Brown did come in that he would shoot Munnerlyn and the defendant into sifter bottoms. Brown then kicked the door, and some one outside said: "Don't shoot." Brown again kicked the door, and, as it opened partially, a gun from the outside was fired in at the door. Witness at that time was standing outside, at the southeast window. He did not see the women on the ground after the first gun fired. When Brown first came up to the house the witness distinctly heard the cocking of a gun and pistol outside. Witness heard Brown talking at the door about the time the first gun fired. The flash of that gun showed that it was fired from the outside into the house, and that the shot ranged north. The next gun was fired through the southwest window into the house. Both of these first two shots were fired from a shot gun.

The next three shots sounded like the reports of a pistol, and these were immediately followed by four or five heavier reports. Witness did not hear the report of Taylor's buffalo gun that night.

The witness saw Munnerlyn immediately after the difficulty. He was then complaining of having been shot in the face. Witness asked him if he fired at all during the fight, and he said that he did not. Witness then dropped the ramrod into both barrels of Munnerlyn's shot gun, and found them both loaded. This was so soon after the firing that Munnerlyn could not have since loaded the gun himself. Munnerlyn tumbled out of the house immediately after the first shot was fired, and Taylor caught him and led him off east towards the public road. A few minutes after the shooting ceased the defendant told the crowd that Rogers shot at him two or three times before he, defendant, fired in his self-defense. Munnerlyn said at the same time and place that Brown shot him at the door, blinding him and burning his face.

The cartridges and belt in evidence the witness identified as the property of Dick Taylor. On the Saturday prior to the difficulty the witness got them for Taylor and saw Taylor shoot three of them at a wild cat. He saw Taylor shoot two others of them at wild geese, a few days before. There were eight cartridges and five shells in the belt after Taylor shot at the wild cat on Saturday. Eight cartridges and five shells were in the belt on this trial. After the second shot, the defendant cried out: "O Lord, I am shot!" There were no pistols in the party with which the witness went to the school house. Taylor had a buffalo gun, Munnerlyn a shot gun, and the defendant a Henry rifle. The witness was on the east side of the school house at the time of the shooting. He did not know where the two Gasses were at that time.

Jesse H. Gass, for the defense, gave substantially the same account of the fight as that given by the witness Semo. Witness was at the southeast corner of the house when Rogers came up. He was on the east side while the firing was going on. In addition to the facts stated by the witness Semo, this witness stated that while Rogers was talking to the defendant, he, Rogers, held his right hand behind him and his left in his pants pocket. He, witness, heard Taylor, who was at the southeast corner, tell Brown to "hold up," as he, Brown, came up to the school house. Taylor did not then, as stated by Brown, present his gun. The

witness heard Brown demand that the ladies be admitted in the school house; heard Munnerlyn refuse, and heard Brown kicking the door. He heard Brown say that no one but the sheriff or his deputy could take possession of the house, and while Rogers had his hand on Munnerlyn's shoulder, he saw Brown force the door open and fire into the house with a shot gun. The ladies left the grounds as soon as this shot was fired. The witness described the subsequent shots as they were described by the witness Semo. He did not hear Taylor's buffalo gun discharged. Munnerlyn did not shoot at all. He saw Munnerlyn stagger backwards from the door, with his hand on his face, when the first shot was fired. He heard the defendant exclaim: "Oh, my shoulder!" when the second shot was fired through the southwest window. Immediately after the shooting ceased, the defendant said in the witness's presence that the deceased fired two or three times at him with a pistol, and that he fired on the deceased in self-defence.

John Allison, brother to the defendant, gave substantially the same account of the fight as was given by Semo and Jesse Gass. In addition, he testified that the three pistol shots, fired after the second shot from the shot gun, were fired by the deceased in the school house, and that they were followed by three or four shots from the defendant's gun. Munnerlyn had the witness's double barreled shot gun that night. He did not discharge it. That gun contained the same charges after the fight that it contained before. It was loaded with turkey shot. This witness denied that he told Sheriff Bunger and John Casburn that the defendant and Munnerlyn killed Rogers, and that Rogers had no pistol. Witness pointed out to Bunger and Casburn a point southeast of the house where he stood a part of time. He was a little east of south when Rogers shot his pistol. Here the defense rested.

W. T. Bunger, in rebuttal, testified, for the State, that on the day after the difficulty, in the presence of John Casburn, the witness John Allison told him that the defendant and Munnerlyn killed Rogers and that Rogers was not armed at the time; that he would not tell a lie to save his brother's life. John Allison was then under arrest, charged with the same offense.

J. C. Casburn, in rebuttal, testified next on behalf of the State, and corroborated the witness Bunger. He stated, in addition, that on the day after the homicide John Allison pointed out to him a point southeast from the house, where he said that he

stood during the fight.    Witness thought the ball which struck
the limb described was fired from the ground, and that the buck
shot holes in the north gable end were made by shots fired from
the left of the door.

J. T. Cunningham testified, for the State, that he did not, in
Arnold's office, tell the defendant that, in contemplation of law,
he was in possession of the school house, but did tell him, at the
drug store, that in taking the house they must do it like white
men, fighting with their fists, and not with guns.    Rogers was
present in court during the trial of the forcible entry and de-
tainer case.

W. P. Beckham testified, for the State, that he thought the
shot in the limb was fired from the ground, and those in the
north gable end of the house from the southwest corner.    This,
however, was but an opinion.

J. E. Ryers, for the State, testified that if a man stood six
inches from the door in front, and fired a gun so that the shot
would pass under the chin of a man standing inside, the load so
shot would strike the roof of the house about the centre.    He
thought, after inspection, that some of the shots in the gable
end were fired from the southeast corner and some from the
door.    At least, the witness thought the holes so indicated.

Mrs. J. H. Brown testified, for the State, that she was present
at the shooting.    Her husband, J. H. Brown, did not kick the
door, but pushed it with his right hand, standing at the time to
the left of the door.    He then had his gun in his left hand, with
the breech resting on the ground.    Munnerlyn fired out of the
door, and shot Brown in the hand.    This was the first shot fired.
Brown then went around to the southwest window and fired
into the house.

C. E. Causey testified, for the defense, as follows: "Myself
and Robert Hollingsworth, under order of the court, went out to
the school house to-day, and took two strips of lumber, to which
we nailed the weather boarding that contained the buck shot
holes—one strip of lumber on each side.    Then we sawed out the
square of the gable end, which is here in evidence.    After we
had taken the square out of the gable end, Mr. Hollingsworth
took a pole and placed it north of the gable end, perpendicu-
larly, and at the place where the shot through the gable end
struck the limb of the tree.    Then I stood at the door and looked
through the opening, seeing the pole through the centre of the
hole, and the limb that was shot, in range through the centre of

the hole. We then climbed up to the limb north of the gable end and cut it in one place, giving it a face and marking the side that was next to the school house, south, and cut a notch in the bottom of the limb. Here we present the limb in evidence. It shows to have been hit in two places, one shot striking from the south and glancing upward. The other looks like it might have been fired from the ground. The door is five inches nearer the west than the east wall of the school house."

Mrs. Brim testified, for the defense, that "on Sunday before the difficulty, at J. H. Brown's house, Miss Lou Gibson told me that she heard John Rogers, the deceased, say that if they got possession of the school house they would get it over his dead body." This testimony was called out by the previous denial of Miss Gibson that she made any such statement to Mrs. Brim.

The witness Graham testified, for the defense, that Jacob Schlitzer told him, in Graham, that Brown fired the first shot of the fight, and fired it in at the door.

Z. T. Woods testified that on the day after the killing F. C. Nolte told him that he, Nolte, was in bed when the fight occurred.

The witnesses Baker, Padgett, McLendon, Rogers, Bullard, White, Hill and Clark, testified, for the defense, that they were familiar with the reputation of J. H. Brown for truth and veracity, and that it was very bad.

Witnesses White and Hill testified that the defendant bore the reputation of a quiet, peaceable, law-abiding man.

The motion for new trial raised the questions involved in the opinion of this court.

*Arnold, Glasgow & Arnold* filed an able and elaborate brief for the appellant, but necessarily too lengthy for insertion.

*J. H. Burts,* Assistant Attorney General, for the State.

Willson, Judge. 1. It was developed in the trial of the case that the court did not err in overruling the defendant's application for a continuance. All the material facts which defendant alleged he expected to prove by the witnesses Jowell, Williams and Kent were sufficiently proved by the testimony of other witnesses who testified on the trial, and defendant was therefore not injured by the absence of those witnesses. As to the witness Pritchard, he appeared during the trial, and the defend-

ant, though offered the opportunity, declined to place him on the stand.

2.   There was no error in overruling defendant's motion to quash the service upon him of the copy of the indictment. It is objected that the writ accompanying the copy of the indictment served upon defendant is not styled as required by law. (Const., Art. 5., sec. 12.) We think the objection is not supported by an inspection of the writ, and that the writ is in all respects sufficient. (Code Crim. Proc., Art. 458.)

3.   Defendant was not jointly indicted with Taylor and Munnerlyn, and he therefore had no legal right to demand that they should be first tried. It was not error to overrule his motion asking that they be placed first upon trial. (*Rucker* v. *The State,* 7 Texas Ct. App., 549; *Shelton* v. *The State,* at present term.)

4.   We find no error in any of the rulings of the court upon any of the questions which arose in the formation of the jury, as to the summoning of jurors, or their qualifications. We have examined the several bills of exception relating to these rulings of the court, and our judgment is that the court committed no error with respect to the jury.

5.   It was not error to refuse to permit defendant to ask the witness J. H. Brown the question stated in the bill of exceptions. It had reference to an immaterial matter, and was wholly irrelevant, and not even admissible for the purpose of laying a basis to impeach the witness.

6.   It was not error to permit the witness J. H. Brown to testify as a witness in behalf of the State. That he was under indictment for an assault upon defendant with intent to murder him, the alleged act being a part of the same transaction for which defendant was upon trial, did not render him an incompetent witness. (Code Crim. Proc., Art. 730.) It might affect his credibility, but not his competency.

7.   It was not error to reject the testimony of the witness Gus Semo that the constable had dispossessed the defendant of the school house at the suit of J. H. Brown, nor was it error to reject the record and judgment in the case of *The State of Texas* v. *J. H. Brown,* wherein Brown appears to have been convicted of the offense of defacing the school house. This proposed evidence, we think, was irrelevant, and if it tended to prove anything at all bearing upon any issue in the case, that tendency would, it seems to us, be unfavorable to the defendant. It might perhaps have been admissible if it had been offered by

the State for the purpose of showing malice on the part of defendant in killing Rogers, as the homicide of Rogers was unquestionably the result of a feud in relation to the school house.

8. There was no error in rejecting the deed offered in evidence by defendant. It was objected to by the district attorney because it had not been filed in the cause three days prior to the trial, and notice of such filing given, as required by law. (Rev. Stats., Art. 2257.) This objection was well taken. It is provided that "the rules of evidence prescribed by the statute law of this State in civil suits shall, so far as applicable, govern also in criminal actions," etc. (Code Crim. Proc., Art. 726; *Johnson* v. *The State*, 9 Texas Ct. App., 249.) In a civil suit, a deed is not *per se* admissible in evidence. To render it admissible it must be recorded, and, after record thereof, it must be filed in the cause in which it is to be used as evidence at least three days before the trial of the cause, and notice of such filing given to the opposite party; or it may be rendered admissible by proving its execution in the manner required at common law. (*Wiggins* v. *Fleishel*, 50 Texas, 57.)

9. There was no error in causing the jury to retire from the court room while argument was being heard by the court upon questions as to the admissibility of evidence offered by the defendant. These were questions of law with which the jury had no concern, and it was very proper that the jury should be removed from the court room during the discussion of the same.

10. It was not error to reject the record showing an appropriation of money by Young county for the building of Flat Rock school house. This proposed evidence was, in our opinion, irrelevant and immaterial, and could have had no legitimate effect upon any issue in the case.

11. No exceptions were taken to the charge of the court, nor is it complained of in the motion for new trial or assignment of errors, except in one particular, and that is that it fails to instruct the jury that they were the exclusive judges of the credibility of the witnesses. We find the charge of the court upon this subject as follows: "You, gentlemen of the jury, are the exclusive judges of the facts of the case and the weight of the testimony." This is very nearly the language used by the law, and we think is sufficient. (Code Crim. Proc., Art. 728.) We have carefully examined the charge of the court, and we find no error in it. It is full, clear and fair, and presents all the law applicable to every phase of the case as made by the evidence.

12.   As to the requested instructions which the court refused, we think that in so far as the same were correct and applicable to the evidence, they were substantially embraced in the charge of the court given to the jury.   Some of the requested charges we do not think contained correct propositions of law, and all of them, in our opinion, were properly refused.

13.   We have examined carefully the voluminous record in this case, and each of the numerous assignments of error and bills of exceptions presented by defendant, and we find no error for which, in our judgment, the conviction should be set aside. There was much conflict in the evidence, and the credibility of witnesses on both sides was attacked.   Twenty-one witnesses testified in behalf of the State, and thirty-four in behalf of the defendant.   It was the peculiar and sole province of the jury, who had these witnesses before them, to sift and weigh their testimony, and pass upon its credibility.   There was ample evidence, if believed by the jury to be true, to establish the defendant's guilt of murder of the second degree.   Evidently the jury believed the evidence which established the defendant's guilt, and their finding is conclusive upon this court.

Finding no error in the judgment it is affirmed.

*Affirmed.*

Opinion delivered June 13, 1883.